# In the United States Court of Federal Claims

No. 19-594C

(Filed Under Seal: October 16, 2020 | Reissued: October 23, 2020)*

<table>
<tr><td>

AARON HASSAY,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.
</td><td>

Keywords: 10 U.S.C. § 1204; Military Disability Pay; Board for the Correction of Naval Records; Arbitrary, Capricious, Abuse of Discretion; Substantial Evidence; Post-Traumatic Stress Disorder; Department of Defense Guidance on PTSD and Military Sexual Trauma; Kurta Memo; Hagel Memo; Wilkie Memo.
</td></tr>
</table>

*Joshua D. Schnell*, Cordatis LLP, Arlington, VA, for Plaintiff.

*Robert R. Kiepura*, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Joseph H. Hunt*, Assistant Attorney General, for Defendant. *Lieutenant Kevin R. Griffin* and *Lieutenant Alyssa E. Williams*, Office of the Judge Advocate General, Department of the Navy, Washington Navy Yard, DC, Of Counsel.

## OPINION AND ORDER

KAPLAN, Judge.

This military disability case is before the Court on cross-motions for judgment on the administrative record. Also before the Court is Plaintiff's motion to supplement and correct the administrative record.

The plaintiff in this case, Aaron Hassay, served in the United States Navy Reserves from 1994 until his honorable discharge in 2002. From October of 1995 through January of 1999, Mr. Hassay served on the USS Sides. He alleges that while on that vessel, a fellow service member sexually assaulted him, his commanding officer physically assaulted him, and active duty service members threatened and verbally abused him. According to Mr. Hassay, as a result of these incidents, he developed post-traumatic stress disorder ("PTSD") and other mental health

---

* This opinion was originally issued under seal and the parties were given the opportunity to request redactions. In a joint response, the parties notified the Court that they had no proposed redactions and the opinion could be released in full.

disorders, which in turn have led to poverty and chronic homelessness in the years since his discharge.

In 2016, Mr. Hassay filed a <u>pro se</u> petition with the Board for the Correction of Naval Records ("BCNR" or "the Board") to change his discharge status to reflect retirement based on disability. Although the Board found Mr. Hassay had a mental health disorder as early as 1998, it concluded that the evidence in the administrative record was insufficient to show: 1) that his mental illness was service-connected, and 2) that he was unfit for continued naval service at the time he was discharged.

Mr. Hassay filed a request for reconsideration which the Board denied. Although an intervening decision by the Board of Veterans Appeals had found that Mr. Hassay's psychiatric disorders were service-connected, the BCNR reaffirmed its earlier finding that Mr. Hassay had failed to establish that at the time of his discharge he was unfit to continue to perform the duties of his office, grade, rank, or rating.

For the reasons set forth below, the Court concludes that the BCNR's decision was arbitrary, capricious, and contrary to law. Specifically, the BCNR failed to address important evidence in the record bearing on whether—in light of his mental health disorders—Mr. Hassay's continued service represented "a decided medical risk" to his health. SECNAVINST 1850.4E encl. 3, § 3302(b)(1). The decision also reflects no consideration of guidance issued by the Department of Defense ("DoD") setting forth the standards and principles that the Board must follow in cases where service members who suffer from service-connected PTSD and/or were victims of sexual assault request changes in their discharge status. Pl.'s Cross-Mot. for J. on the Admin. R. and Opp'n to Def.'s Mot. for J. on the Admin. R. and Mot. to Dismiss ("Pl.'s Cross-MJAR") at 8, ECF No. 23. Therefore, the Court **GRANTS** Mr. Hassay's motion for judgment on the administrative record, ECF No. 23, and **DENIES** the government's motion, ECF No. 20. The Court **REMANDS** the case back to the Board for its consideration of all of the evidence of record and any additional evidence that Mr. Hassay may submit on remand in light of the DoD guidance. Given this disposition of the case, the Court **DENIES** as moot Mr. Hassay's motion to supplement and correct the administrative record. ECF No. 24.

## BACKGROUND

### I.    Mr. Hassay's Service in the United States Navy Reserves

Mr. Hassay enlisted in the Navy Reserves, Sea Air Mariner Program, on May 26, 1994. Admin. R. ("AR") Vol. X 403, 406, ECF No. 12-10. He was found medically qualified to serve based on an entrance medical examination. AR Vol. IX 370–71, ECF No. 12-9.

From September 26, 1994 to July 25, 1995, Mr. Hassay underwent eleven-weeks of training. AR 394–96. Thereafter, between November of 1994 and July of 1995, he served for intermittent periods aboard the USS Copeland, a guided missile frigate. AR 388. On October 1, 1995, the Navy assigned Mr. Hassay to another guided missile frigate, the USS Sides, where he served two weekends a month, as well as some multi-week deployments, working alongside active-duty seamen, until he was reassigned in January 1999. AR Vol. I 33, ECF No. 12-1; AR Vol. II 72–73, ECF No. 12-2; AR Vol IV 159, ECF No. 12-4; AR 388.

2

According to Mr. Hassay, during his service on the USS Sides, fellow service members threatened and assaulted him and subjected him to verbal abuse based on his status as a reservist. AR 159–60. Specifically, he alleges that another service member attempted to sexually assault him in 1996. Id. In 1997, he claims, he was physically threatened by his fellow seamen twice, once with a gun and then with a knife. AR 160. On another occasion, contends Mr. Hassay, the Command Master Chief—i.e., the senior enlisted man on the USS Sides—assaulted and beat him. Id. And throughout his service, Mr. Hassay alleges, active-duty service members he served alongside mocked him for being a reservist. Id.

The Court notes that the documents that describe the assaults and verbal abuse were prepared over a decade after Mr. Hassay completed his military service and no contemporaneous evidence exists in the administrative record regarding these incidents. The documents upon which Mr. Hassay relies to substantiate his allegations include: 1) a letter from a clinical psychologist who saw Mr. Hassay several times in August of 2013, AR 31–32; 2) a May 26, 2015 letter from a psychiatrist who had then treated Mr. Hassay for two years, AR 33; and 3) a July 6, 2016 opinion of the Board of Veterans' Appeals granting Mr. Hassay benefits for service-related acquired psychiatric disorders, AR 154–68. Mr. Hassay has also moved to supplement the record to include his hearing testimony before the Board of Veterans Appeals in which he details the abuse he claims to have suffered aboard the USS Sides.

The record reflects that in 1998—during his time on the USS Sides—Mr. Hassay attempted to transfer to the Army but the Army rejected his request. AR 146–48, 150; AR Vol. V 222, ECF No. 12-5; AR Vol. VI 223, ECF No. 12-6. The administrative record contains only limited documentation of the reasons for the Army's decision, consisting of a one-page computer printout entitled "Medical Issues" generated by "USMEPCOM," i.e., the U.S. Military Entrance Processing Command, and which Mr. Hassay apparently acquired in 2013 by making a request under the Freedom of Information Act. AR 222–23. The document is somewhat difficult to decipher. Most relevant to this case, it reflects that the Army rejected Mr. Hassay's transfer request and assigned a "failure code" which reads as follows: "38-Spine, Other Musculoskeletal/Psych left open." AR 223.

The administrative record also includes a letter that the Office of the Inspector General ("OIG") sent to Mr. Hassay in July of 2016, responding to his "request for assistance regarding [his] permanent medical disqualification (3P) for Spine, other Musculoskeletal/Psych during [his] transfer physical conducted at [the] San Diego Military Entrance Processing Station (MEPS) in 1998." AR 146. In the letter, the OIG advised Mr. Hassay that "the Navy should have completed a DD Form 368 (Request for Conditional Release)" in connection with his transfer request and that "the Army should have completed section IV of the DD Form 368 notifying the Navy of [Mr. Hassay's] medical disqualifications as outlined in DodI 1205.05 (Transfer of Service Members Between Reserve and Regular Components of the Military Services) Enclosure 3, para d (1)." Id. The OIG was not able to determine if the Army completed the form or if it provided the form to the Navy. Id.

On August 8, 1999, a year after the Army denied his request to transfer, the Navy reassigned Mr. Hassay to the Military Sealift Command in San Diego, California. AR 388. Shortly thereafter, on August 13, 1999, Dr. Peter J. Killian, a Navy physician, conducted a medical exam of Mr. Hassay. AR Vol. III 99, ECF No. 12-3. Dr. Killian's report reflects that Mr.

Hassay requested an "FMH [Fleet Mental Health] Consult" because of "Depression/Stress With Relationship." Id. Dr. Killian reported that Mr. Hassay had a "history of depression/Bipolar disorder," and that he was then taking Lithium. Id. The report states that Mr. Hassay complained of a number of symptoms of impaired mental health, including "disturbed sleep, disinterest, [increased] guilt over recent relationship, [decreased] concentration, [decreased] appetite." Id. Dr. Killian noted that Mr. Hassay had relayed that he was experiencing "guilt over [a] recent relationship" as well as the "recent stress of breakup [with] girlfriend whom he had dated for 4 years." Id.

Dr. Killian remarked in his report that Mr. Hassay did not have "active [suicidal ideation] or [homicidal ideation]," but that he was "willing to contract for safety until mental health appointment next [T]hursday." Id. The report reflects Dr. Killian's recommendation for specific follow-up actions which included the execution of a "safety contract," a check-in that day with "mental health" to provide Mr. Hassay with "emergency contact numbers," and a follow-up with the mental health clinic on the following Thursday. Id. The administrative record does not include any documents reflecting whether the referenced "check-in" or follow-up appointment ever took place.

On June 10, 2000, Mr. Hassay saw another Navy doctor, apparently for an annual exam. AR 226. The doctor's signature is almost illegible, but his or her last name appears to be "Smith." Id. The record of the exam in the administrative record appears to be incomplete. In particular, it does not contain the section of the "Annual Certificate of Physical Condition" form that is filled out by the service member. Mr. Hassay has submitted a copy of the form (which he apparently secured from the Department of Veterans Affairs) as an exhibit to his complaint. See App. to the Compl. Ex. 10, at A33–A34, ECF No. 6. In the form, Mr. Hassay checked "no" in response to the question whether he had "any physical defects, family or mental problems which might restrict [his] performance on active duty or prevent [his] mobilization." Id. at 34. However, under the section set aside for "additional comments," Mr. Hassay remarked that "sometimes if I worry or something I feel stress in my heart and down to my left hand and I don't like it." Id.

In his report on the June 10, 2000 examination, the Navy doctor recorded that in or around the fall of 1999, i.e., within a few months after Dr. Killian examined him, Mr. Hassay stopped taking his Lithium prescription because of the side effects. AR 226. The doctor reported that Mr. Hassay was "currently dealing with stressful female relationships," but opined that he "d[id] not appear depressed." App. to Pl.'s Cross-MJAR Ex. 10, at A72, ECF No. 23-1. The doctor made note of Mr. Hassay's visit the preceding year to "Navy docs" and their "ref[erral] to co. mental health." AR 226. He also observed that Mr. Hassay "had multiple stressors & [was] presently feeling [a] need for return to counselors for his benefit." Id. As with the follow-up that Dr. Killian directed in 1999, nothing in the record shows whether Mr. Hassay received additional counseling to address these "multiple stressors" after the June 2000 physical exam.

On May 25, 2002, the Navy honorably discharged Mr. Hassay when his reserve enlistment expired. AR 387. At the time of his discharge, the Navy designated Mr. Hassay eligible to reenlist. Id.

## II.     Post-Discharge Medical Developments

According to the Board of Veterans Appeals, in August of 2002, just three months after his discharge, Mr. Hassay was "hospitalized" for depressive disorder. AR 160 (Board of Veterans Appeals' decision stating that "an August 2002 private treatment record shows that the appellant was hospitalized for depressive disorder").[1] Further, according to Mr. Hassay, in the years following his discharge from the Navy Reserves, he experienced severe mental illness, poverty, and chronic homelessness. AR 31, 153, 160, 262.

There is nothing in the administrative record that documents any treatment Mr. Hassay might have received during the decade after his discharge. The record reveals, however, that sometime in 2013, a San Francisco County Veterans Service Officer referred Mr. Hassay to a clinical psychologist for an assessment of possible PTSD. AR 31–32. Mr. Hassay then met with Dr. Constance Louie three times in August of 2013. Id.

Dr. Louie recorded her impressions of Mr. Hassay's mental health in a September 4, 2013 letter. Id. She documented that Mr. Hassay had told her that while serving aboard the USS Sides, he "felt harassed and ostracized because he was a reservist." AR 31. In fact, she noted, Mr. Hassay stated to her that the Command Master Chief had assaulted him. Id. Dr. Louie observed that during the period he served on the USS Sides, Mr. Hassay "became depressed, isolated, and fearful of being trapped on a ship with people who would attack him physically and verbally." Id. The effects of this stress spilled over into his civilian life, she stated, where "he drank more, got into numerous fights," "experienced anxiety attacks," failed to complete college, and had his engagement to his fiancé canceled. Id. Dr. Louie also noted that Mr. Hassay had been unable to maintain employment since his discharge and that, in July of 2005, the Social Security Administration had deemed him disabled for purposes of its rules. Id.[2]

Dr. Louie concluded that Mr. Hassay met the DSM criteria for a diagnosis of chronic PTSD. AR 32. His score on the test used by the military (the PCL-M) also indicated a diagnosis

---

[1] The Court notes that appended to Mr. Hassay's original (but not his amended) complaint is a computer printout reflecting that Mr. Hassay underwent a "psychiatric assessment" at the San Diego County Psychiatric Hospital on August 27, 2002. App. to the Compl. Ex. 12, at A36–A37. It shows that he was admitted at 2:30 PM and discharged one hour later. Id. at A36. The staff psychiatrist recorded that Mr. Hassay exhibited an "euthymic" mood with an "affect" he described as "a bland smile in a narrow range." Id. at A37. The narrative states that Mr. Hassay's "thought processes [were] logical and goal directed" and that they were "void of suicidal and homicidal thoughts and there is no evidence of paranoid, grandiose or obsessional ideation." Id. The diagnosis listed is "depressive disorder MOS." Id. at A36; see also id. at A37 (diagnosing Mr. Hassay with "depressive disorder not otherwise specified"). It is unclear to the Court whether this visit to the San Diego County Psychiatric Hospital is the "hospitalization" to which the Board of Veterans Appeals referred in its decision. AR 160.

[2] VA Records reflect that the Social Security Administration's award of benefits was based on disability arising out of his affective (mood) and anxiety disorders. AR 160.

of PTSD. Id. She advised that Mr. Hassay "would likely benefit from individual therapy to reduce [his] distressing symptoms." Id.

Thereafter, and until at least 2017, Mr. Hassay was under the care of Dr. William W. Foote, a psychiatrist. AR 33. Dr. Foote had previously served for over seven years as a Naval Officer in the medical corps, with a specialty in psychiatry. AR 153. Dr. Foote treated Mr. Hassay for his PTSD as well as Attention Deficit Hyperactivity Disorder, Inattentive type. AR 33, 153. In a 2015 letter, Dr. Foote observed that Mr. Hassay had been under his care for two years for "symptoms of anxiety, hyper-vigilance, sleep disorder and depressed mood." AR 33. He explained that Mr. Hassay suffered from "chronic PTSD," which was "directly related to his military experience." Id. Specifically, Dr. Foote opined, Mr. Hassay's weekend deployments as a reservist "caused multiple traumas which led to his PTSD." Id. Dr. Foote described Mr. Hassay as a "fearful" man who "did not know how to speak for himself to the proper authorities for his psychological needs and help." Id.

In 2017, after the first decision of the Board for the Correction of Naval Records ("BCNR" or "the Board") at issue in this case, Dr. Foote wrote a follow-up letter on Mr. Hassay's behalf. AR 153. He stated that, in reviewing Mr. Hassay's records, he was surprised to learn that "in 1998 [Mr. Hassay] was seen by a Navy psychiatrist[3] and was diagnosed with a variety of possible problems." Id. In light of his own experience as a former Navy Officer, Dr. Foote opined, it seemed that the Navy had simply "overlooked" Mr. Hassay and his problems. Dr. Foote observed that he had "seen this type of problem early in [his] career," and that it was "clear" that when in active duty status Mr. Hassay "could not handle the pressures" of that status. Id. He further opined that the Navy's decision to keep Mr. Hassay in the reserves with active-duty weekends "compromised him even more and created more severe problems for him not only while he was in service" but also post-discharge. Id. According to Dr. Foote, Mr. Hassay "should not have been retained even in the reserve status given his symptoms and inability to adapt to the military life." Id. Instead, he posited, "a medical administrative discharge would have been an effective way to handle the problems that [Mr. Hassay] was facing while in the reserve unit." Id. Dr. Foote concluded that "[h]ad he been discharged at the time when [he] was asking [for] . . . help due to his emotional state in 1999, he may have had a more positive and productive life." Id. "By maintaining his status as a reservist," Dr. Foote explained, "his diagnosis of PTSD was worsened and his symptoms also worsened." Id.

## III.    The Board of Veterans Appeals' Decision

In September of 2014, the Oakland California Regional Office of the Department of Veterans Affairs rejected Mr. Hassay's claims for Veterans Affairs ("VA") benefits related to his mental illness and a lower back disorder. AR 154. On July 8, 2016, the Board of Veterans' Appeals issued a favorable decision on Mr. Hassay's appeal of that determination, finding that Mr. Hassay's psychiatric conditions were, in fact, service related. Id.

---

[3] There is no documentation in the administrative record of any examination of Mr. Hassay by a Navy psychiatrist in 1998. It is possible Dr. Foote meant to refer to the 1999 examination Dr. Killian conducted, although the record does not reveal whether Dr. Killian is a psychiatrist.

The Veterans Law Judge observed that Mr. Hassay had then-current diagnoses of major depressive disorder, anxiety disorder, schizoaffective disorder, bipolar disorder, and PTSD. AR 156. She noted that his treating psychiatrist and a clinical psychologist were of the view that these conditions were related to a mental health injury that Mr. Hassay sustained during his service in the Navy Reserves. Id. The Veterans Law Judge also found credible Mr. Hassay's testimony concerning the "stressors" he experienced while he served aboard the USS Sides, which she identified as including: 1) an attempted sexual assault, 2) being threatened with a gun, 3) being threatened with a knife, 4) an assault by his Command Master Chief, 5) weapons training conducted on the ship, 6) being mocked by active duty service members for being "only" a reservist, and 7) fears of being called to active duty following September 11, 2001. AR 159–60. She found that his request to transfer to the Army served as a "marker" that sufficiently corroborated the occurrence of the events about which he testified. AR 162. She also made note of Mr. Hassay's testimony that early on in his service, and before events aboard the USS Sides, he had received many awards. AR 160.[4]

## IV.   Proceedings before the Board for the Correction of Naval Records

In the meantime, on January 21, 2016, while pursuing his appeal of the denial of VA benefits, Mr. Hassay filed a petition with the BCNR. He requested that the Board change the characterization of his discharge from "honorable" to one based on medical disability arising out of PTSD and spinal/musculoskeletal issues. AR 262.

The BCNR denied the petition on November 1, 2016. AR 101–02. The substance of its decision is only one or two paragraphs long. The BCNR acknowledged that the record established that Mr. Hassay "was suffering from a mental health disorder as early as 1998." AR 101. Specifically, it cited a 1999 "medical entry" (presumably referencing Dr. Killian's report) that showed that Mr. Hassay had a "history of depression that required Lithium as a treatment," as well as evidence that he "failed to meet Army accession standards in 1998 due to psychological and musculoskeletal reasons." Id. The BCNR also referenced the 2015 letter from Dr. Foote and stated that it had reviewed "a number of other documents that purport to support [Mr. Hassay's] assertions." Id.

The Board concluded, however, that the evidence did not "establish that [Mr. Hassay's] condition was incurred or aggravated in connection with [his] military service." Id. To the contrary, the Board observed that a "1998 medical report ties the aggravation of [Mr. Hassay's]

---

[4] The Judge was more skeptical about Mr. Hassay's claim that his lower back problems were related to his service. She observed that although the Army found Mr. Hassay ineligible for transfer because of "spine, other musculoskeletal" problems, none of his service treatment records reflected a back injury or disability. AR 163–64. She directed the Department of Veterans Affairs to afford him an examination "to determine the nature and etiology of his low back disorder," AR 163, but the record does not reflect whether that examination ever occurred. Before this Court, Mr. Hassay asserts in passing that he should have also been found eligible for a medical retirement as a result of spinal disability. Pl.'s Cross-MJAR at 35. Because the argument is not developed at all, the Court will not address it.

mental health condition to personal relationship issues." Id.[5] Additionally, the Board found "no evidence to support [Mr. Hassay's] assertion of an assault by [his] Command Master Chief or military sexual trauma." Id.[6]

The Board also concluded that there was insufficient evidence to show that Mr. Hassay was "unfit for continued naval service" at the time of his discharge. AR 102. The BCNR found unpersuasive the Social Security Administration's ("SSA") 2005 finding that Mr. Hassay was disabled because SSA disability standards are different from those governing fitness for military service. Id. It also observed that Dr. Foote's 2015 letter did not address Mr. Hassay's fitness for duty at the time of his discharge. Id. On the other hand, the BCNR found, Mr. Hassay's performance evaluations "leading up to his discharge" in 2002 showed that his performance had been "slightly above average." Id. The Board took particular note of his second to the last performance evaluation, which covered the period from June 2000 to June 2001, and which "contained the highest performance trait average of [his] career." Id. In addition, the Board thought it important to highlight that this particular evaluation "memorialized the fact that [Mr. Hassay was] a member of the Navy baseball team." Id.[7]

On December 6, 2016, Mr. Hassay requested that the Board reconsider its decision in light of additional evidence, including the decision of the Board of Veterans Appeals. See AR 103–04. The BCNR denied the request on February 12, 2018. AR 6–7. The Board did not reiterate its previous finding that Mr. Hassay had failed to show that his mental illness was service connected. In fact, it recognized that Mr. Hassay had "service[-]connected disability conditions" but remained of the view that they had not "created a sufficient occupational impairment to warrant [Mr. Hassay's] referral to a medical board or the Physical Evaluation Board." AR 6.

---

[5] This reference is a bit confusing because there is no 1998 "medical report" in the record. The Court assumes that the Board was referencing the 1999 report prepared by Dr. Killian.

[6] The Board also stated that it found its decision bolstered by the VA "decision to deny any service connection to [Mr. Hassay's] disabilities." AR 101–02. The Board was apparently referring to the decision of the Oakland Regional Office of the Department of Veterans Affairs, mentioned above. It was evidently unaware at the time of its decision that the Board of Veterans Appeals had already reversed the regional office's determination and found that Mr. Hassay's psychiatric disorders were service-related.

[7] The Court notes that although the BCNR states that Mr. Hassay was a member of "the Navy baseball team," the performance evaluation actually stated that Mr. Hassay was a member of "a Navy Baseball Team." AR 238 (emphasis supplied). The Court understands "the" Navy baseball team to be the U.S. Naval Academy's team. At least at the present time, while there are all-Navy softball teams (one for men and one for women) there is no all-Navy baseball team. See All-Navy Teams, Commander Naval Installations Fitness, Sports and Deployed Forces Support (Oct. 14, 2020, 2:25pm), https://www.navyfitness.org/all-navy-sports/all-navy-teams. The Court therefore assumes that the baseball team of which Mr. Hassay was once a member was part of an intramural sports league.

The Board noted that it "substantially concurred" with the opinion of its Senior Medical Advisor, AR 6, who had reviewed the record and concluded that "a preponderance of the available evidence does not support the applicant's request for either a finding of unfit or a disability retirement at discharge from the [Navy Reserves] in 2002," AR 10. The Advisor remarked that the performance evaluations Mr. Hassay received up to eleven months prior to his discharge "indicat[ed] at least adequate functioning." Id. He also noted that Mr. Hassay completed his service period and that his discharge documents contained no indication "of conditions barring his reenlistment." Id. He observed that Mr. Hassay earned more income in 2003 (the year following his discharge) than he did in any succeeding year. Id. Indeed, although the Advisor did not mention it, in every subsequent year for which the administrative record contains evidence (i.e., between 2004 and 2013), Mr. Hassay recorded no reportable income at all. See AR 100. The Advisor characterized the evidence of unfitness in the record as "speculative" in nature. AR 10. In his view, even had Mr. Hassay been referred to a Physical Evaluation Board "the likely result would have been [a finding that he was] either Fit or Physically Qualified." AR 11.

In finding insufficient proof of unfitness at the time of discharge, the Board also relied upon Mr. Hassay's performance evaluations, specifically the two annual evaluations he received in the period between June 1999 and June 2001. AR 6–7.[8] It found that the 3.86 "trait average" he earned on the evaluation of his performance for the period between June 16, 1999 and June 15, 2000 was "conclusive evidence" that Mr. Hassay was performing above standards after 1998 when, according to the Board, he claimed to be unfit. AR 6. It similarly concluded that his 3.14 "trait average" for the June 2000 to June 2001 performance period provided "persuasive evidence" that—notwithstanding any symptoms he was experiencing—he was able to perform the duties of his office, grade, and rank. AR 6–7. The Board highlighted comments in both performance evaluations that mentioned Mr. Hassay's "positive contributions to the command mission" and "excellent physical condition." AR 7. It found immaterial the Board of Veterans Appeals' recent decision awarding Mr. Hassay benefits "since eligibility for compensation and pension disability ratings by the [VA] is tied to the establishment of service connection and is manifestation-based without a requirement that unfitness for military duty be demonstrated." Id. In short, the Board stated, the information contained in the two performance evaluations was "sufficiently convincing" for it to find that Mr. Hassay was "fit for duty at the time of [his] discharge despite the evidence that [his] symptoms may have worsened in the years after [his] discharge." Id.

## V.  The Present Case

On April 22, 2019, Mr. Hassay filed the present suit, seeking a ruling that the BCNR's decision denying his entitlement to military disability retirement pay and other benefits was arbitrary, capricious, contrary to law, and unsupported by substantial evidence. ECF No. 1. In his original complaint, Mr. Hassay cited 10 U.S.C. § 1201 as the source of his entitlement to monetary relief. After the government moved to dismiss, ECF No. 13, Mr. Hassay filed an amended complaint on January 27, 2020, adding 10 U.S.C. § 1204 as an alternative basis for

---

[8] There apparently were no evaluations of Mr. Hassay's performance for the period between June 2001 and May 2002 when he was discharged.

relief. ECF No. 18. The Court then denied the government's motion to dismiss as moot. ECF No. 19.

The government filed the administrative record on October 21, 2019, ECF No. 12, and then filed a motion for judgment on the administrative record on March 20, 2020, Def.'s Mot. for J. on the Admin. R. ("Def.'s Cross-MJAR"), ECF No. 20. Mr. Hassay filed a cross-motion for judgment on the administrative record on April 24, 2020. Pl.'s Cross-Mot. for J. on the Admin. R. and Opp'n to Def.'s Mot. for J. on the Admin. R. and Mot. to Dismiss ("Pl.'s Cross-MJAR"), ECF No. 23.

On April 25, 2020, Mr. Hassay filed a motion to supplement and correct the administrative record, ECF No. 24, which the government has opposed, ECF No. 27. In the motion, Mr. Hassay requested that the Court add the following documents to the record: 1) Mr. Hassay's declaration, describing the circumstances of the Army's denial of his transfer request in 1998; 2) Mr. Hassay's January 27, 2016 testimony before the Board of Veterans Appeals; and 3) a January 23, 2017 letter signed by a psychiatrist and a therapist at the San Francisco VA Medical Center in which they opined, among other things, that Mr. Hassay had been "clearly and severely impacted by his time in the military." App. to Pl.'s Mot. to Suppl. and Correct the Admin. R. Ex. 3, at 47, ECF No. 24-1. Briefing on all pending motions has been completed and oral argument was held on the motions via videoconference on September 17, 2020.

## DISCUSSION

### I. Jurisdiction

Under the Tucker Act, the Court of Federal Claims has jurisdiction to hear "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). While the Tucker Act waives the sovereign immunity of the United States to allow a suit for money damages, United States v. Mitchell, 463 U.S. 206, 212 (1983), it does not confer any substantive rights on a plaintiff, United States v. Testan, 424 U.S. 392, 398 (1976). Therefore, a plaintiff seeking to invoke the court's Tucker Act jurisdiction must identify an independent source of a substantive right to money damages from the United States arising out of a contract, statute, regulation, or constitutional provision. Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1306 (Fed. Cir. 2008).

It is well established that Sections 1201 and 1204 of Title 10 of the United States Code— which govern military disability retirement—are money-mandating statutes. Pipes v. United States, 791 F. App'x 910, 916 (Fed. Cir. 2019); Fisher v. United States, 402 F.3d 1167, 1174 (Fed. Cir. 2005) (citing Sawyer v. United States, 930 F.2d 1577 (Fed. Cir. 1991)). Accordingly, this Court has jurisdiction over Mr. Hassay's claims seeking monetary relief.

### II. Standard of Review

The Court of Federal Claims reviews decisions of military correction boards based upon the administrative record. Walls v. United States, 582 F.3d 1358, 1367 (Fed. Cir. 2009). Parties may move for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the

Court of Federal Claims (RCFC). In deciding a motion pursuant to RCFC 52.1, the court makes "factual findings . . . from the record evidence as if it were conducting a trial on the record." Bannum, Inc. v. United States, 404 F.3d 1346, 1357 (Fed. Cir. 2005). Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

The Court reviews the administrative record to determine whether a board's decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to law. See Chappell v. Wallace, 462 U.S. 296, 303 (1983) (noting that a decision of the Board for the Correction of Naval Records is "subject to judicial review" and may be set aside if it is "arbitrary, capricious or not based on substantial evidence"); Barnick v. United States, 591 F.3d 1372, 1377 (Fed. Cir. 2010); see also Walls, 582 F.3d at 1367 (stating that it is "well established that judicial review of decisions of military correction boards is conducted under the APA").

The scope of this judicial review is a deferential one, as "determining who is fit or unfit to serve in the armed services is not a judicial province." See Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983). The arbitrary and capricious standard of review "does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence." Id. at 1157. In determining whether the conclusion is supported by substantial evidence, "all of the competent evidence must be considered . . . and whether or not it supports the challenged conclusion." Id. (emphasis omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). This Court may not "substitute [its] judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." Heisig, 719 F.2d at 1156.

## III.   Pertinent Statutory and Regulatory Provisions

The retirement or separation of members of the military because of medical unfitness is governed by 10 U.S.C. Ch. 61. Section 1204 of Chapter 61 applies to service members who are not covered by sections 1201, 1202, or 1203—that is, it covers "[m]embers on active duty for 30 days or less or on inactive-duty training." Id. Because Mr. Hassay was never called to active duty for more than 30 days, his claim is covered by section 1204, not section 1201.

A member eligible for retirement pay under section 1204 will receive such pay, computed under 10 U.S.C. § 1401, where the Secretary finds the member "unfit to perform the duties of his office, grade, rank, or rating because of physical disability," and where the member has either served for at least 20 years or has a disability rated at least 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs. 10 U.S.C. § 1204(4).

The Department of the Navy Disability Evaluation Manual ("the Manual") governs the processing of disability cases for members of the Navy Reserves. SECNAVINST 1850.4D (hereinafter "1998 Manual") encl. 1, § 1002(b); SECNAVINST 1850.4E (hereinafter "2002 Manual") encl. 1, § 1002(b) (stating that "[t]his instruction applies to all members of . . . the reserve component").[9] SECNAVINST 1770.3B is incorporated into the Manual for its processing of disability evaluation for reservists. App. to Def.'s Cross-MJAR Ex. 3, ECF No. 20-3.

The Manual provides that "[a]ny condition that appears to significantly interfere with performance of duties appropriate to a service member's office, grade, rank or rating will be considered for [Medical Evaluation Board ("MEB")] evaluation." 1998 & 2002 Manuals encl. 8, § 8001(e). Therefore, when "members present[] for medical care whose physical or mental fitness to continue naval service is questionable," "line commanders, commanding officers[,] and individual medical and dental officers" are required to "promptly identify" them "for evaluation by Medical Boards and appropriate referral to the [Physical Evaluation Board ("PEB")]." Id. § 1005; see also id. encl. 3, § 3106 (stating that "[t]here exists no authority to omit or postpone disability evaluation of physical impairment, which renders questionable the ability of service members to perform reasonably the duties of office, grade, rank, or rating").

An MEB is composed of physicians who "identify members whose physical and/or mental qualification to continue on full duty is in doubt or whose physical and/or mental limitations preclude their return to full duty within a reasonable period of time." Id. encl. 2, § 2043. An MEB must refer a case to the PEB when it finds a "member's fitness for continued naval service questionable by reason of physical or mental impairment." Id. § 3201(a).

At the PEB, "[t]he sole standard to be used in making determinations of physical disability as a basis for retirement or separation is unfitness to perform the duties of office, grade, rank or rating because of disease or injury incurred or aggravated while entitled to basic pay." Id. § 3301. The Manual specifies that "[t]he presence of a disease or injury does not, of itself, justify a finding of Unfit." Id. § 3901(c). Instead, "[a] service member shall be considered Unfit when the evidence establishes that the member, due to physical disability, is unable to reasonably perform the duties of her office, grade, rank, or rating (hereafter called duties) to include duties during a remaining period of Reserve obligation." Id. § 3302(a).

The PEB may consider several criteria "[i]n making a determination of a member's ability to [reasonably] perform his/her duties." Id. § 3302(b). As relevant to this case, one of those criteria is whether the service member's "[m]edical condition represents a decided medical risk to the health of the member or to the welfare of other members were the member to continue on . . . Active Reserve status." Id. § 3302(b)(1).

---

[9] Both the 1998 and 2002 versions of the Manual apply to Mr. Hassay's case. There are no material differences between the 1998 and 2002 versions of the Manual for the purposes of this case. The 1998 Manual is attached as Exhibit 1 to the government's MJAR, ECF No. 20-1, and the 2002 Manual is attached as Exhibit 2, ECF No. 20-2.

## IV.    Merits

The issue before the Court on the parties' cross-motions for judgment on the administrative record is whether the BCNR's decision denying Mr. Hassay's request to correct his records to reflect a disability retirement is arbitrary, capricious, contrary to law, or unsupported by substantial evidence. Mr. Hassay contends the Board's decision must be set aside because it "ignored relevant in-service and post-discharge medical evidence," which he argues demonstrates: 1) that he should have been referred to the Disability Evaluation System at least as early as 1998 when his request to transfer to the Army was denied, and 2) that he was unfit for continued service as of the date of his discharge in May 2002. Pl.'s Cross-MJAR at 18. Mr. Hassay also accuses the BCNR of indulging in "impermissible negative inferences about purported gaps in [his] in-service medical records" that were caused by the Navy's failure to follow its own regulations. Id. at 19. Further, Mr. Hassay argues, the BCNR erred when it "failed to apply (or even acknowledge) the binding DoD guidance that requires the BCNR to give liberal consideration and favorable evidentiary presumptions to veterans like Mr. Hassay who suffer from service-connected mental illness." Id.

The Court agrees that the BCNR's decision was not supported by substantial evidence. First, the Board did not apply the criteria for unfitness set forth in the Navy Manual when it considered whether Mr. Hassay was fit for duty. Specifically, neither the Board's original decision nor its decision on reconsideration nor the memorandum of the Board's Senior Medical Advisor reflect any consideration of whether Mr. Hassay's continued service either at the time of his discharge or in the preceding years presented "a decided medical risk" to his health. See 1998 & 2002 Manuals § 3302(b)(1). As described above, consistent with Navy regulations, to the extent that continued service would present such a risk to Mr. Hassay's health, he would be "unable to reasonably perform the duties of his/her office, grade, rank, or rating," and would therefore be considered "unfit." Id. § 3302(a).[10]

Further, the Board's fitness determination was not supported by substantial evidence because it was not based on the record as a whole. See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (citing Bowman Transp. Inc. v. Ark.-Best Freight Sys., 419 U.S. 281, 285 (1974)) (holding that an agency must "consider[ ] the relevant factors," and that agency action may be overturned where it "entirely fail[s] to consider

_____

[10] In its brief, the government argues that section 3302(b) of the Manual does not mandate that a service member be found unfit if his continued service would present a decided medical risk to him. Its argument is based on the fact that the Manual states that the existence of such a risk is one of the factors that the Navy "may" consider in determining fitness. Def.'s Reply in Support of its MJAR and Resp. to Pl.'s Cross-MJAR ("Def.'s Reply") at 9–10, ECF No. 27. This argument lacks merit. The Manual states that a member is unfit for duty if he is "unable to <u>reasonably</u> perform the duties of his/her office, grade, rank, or rating." Id. § 3302(a) (emphasis supplied). It then provides that a member may be found unable to "reasonably" perform his or her duties where doing so would present a "decided medical risk" to his health. Id. § 3302(a), (b)(1). While the word "may" is used to identify the factors relevant to determining unfitness, nothing in the Manual suggests that—where continued service poses such a risk—the Navy has the discretion to nonetheless deem the service member fit for duty.

an important aspect of the problem"); Heisig v. United States, 719 F.2d 1153, 1157 (Fed. Cir. 1983) ("Under the substantial evidence rule, all of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion."). Instead, the Board's determination rested entirely on two cursory performance evaluations Mr. Hassay received during the latter part of his service—one for the period from June 1999 through June 2000, and the other for June 2000 through June 2001. The Board found that the "above average" scores and the comments on the evaluations were "sufficiently convincing for the Board to find that [he was] fit for duty at the time of [his] discharge despite the evidence that [his] symptoms may have worsened in the years after [his] discharge." AR 7.

The Court notes that no performance evaluation in the record covers the last eleven months of Mr. Hassay's service (between June 2001 and May 2002). But more to the point, while performance evaluations are relevant to whether a service member is fit for duty, it is error to place exclusive reliance upon them where there is other contrary evidence in the record. See Dzialo v. United States, 5 Cl. Ct. 554, 564 (1984) (citing Imhoff v. United States, 177 Ct. Cl. 1, 7 (1966)) (holding that positive performance evaluations are relevant but not dispositive "as one of several indicia used to determine" fitness for duty); see also Heisig, 719 F.2d at 1157 (upholding the decision of a correction board because it "was not based solely on the evidence of continued performance of duty, of superior ratings, of omission to seek medical attention, or of playing golf and softball, but on all of the evidence"). [11]

In this case, it was particularly unreasonable for the Board to place so much reliance on the two performance evaluations because the gravamen of Mr. Hassay's claim is that—even if he were capable of performing at an acceptable level—he did so at substantial risk to his mental health. In that regard, the Board did not discuss or take into account the evidence in the record that was most relevant to the medical risks posed to Mr. Hassay by continued service. These included the opinions of Mr. Hassay's treating psychiatrist, Dr. Foote, as well as the views of other mental health professionals. They opined that Mr. Hassay suffered permanent psychological injury because he continued to serve, notwithstanding that he suffered from service-related PTSD. See AR 31 (2013 letter from Dr. Louie) (summarizing Mr. Hassay's report of the assault by his Command Master Chief aboard the USS Sides and observing that the experience made Mr. Hassay "depressed, isolated, and fearful of being trapped on a ship with people who would attack him physically and verbally," and caused impacts in his civilian life including increased alcohol consumption, "numerous fights," and "anxiety attacks"); id. at 33 (2015 letter from Dr. Foote) (stating that "[h]istorically, [Mr. Hassay's] PTSD is directly related to the time that he spent in the military, the US Navy").

---

[11] The government cites Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005), as support for its contention that acceptable performance alone can constitute substantial evidence that a service member is fit for duty. But in that case, substantial evidence supported the Army's discharge determination because the plaintiff was not only performing effectively but had also undergone a pre-discharge medical examination that did not uncover any fitness for duty issues. Further, in Chambers, the Army regulations in effect at the time of discharge presumed a service member to be fit if he or she was effectively performing his or her military duties. Id. No such presumption exists under the regulations that govern here.

The views Dr. Foote expressed in his 2017 letter are especially relevant, yet there is no indication in the Board's decision or the Senior Medical Advisor's memorandum that they were considered or, if they were, why they were rejected. Dr. Foote, a psychiatrist and former Navy medical officer, opined specifically on the question of whether Mr. Hassay's continued service presented a "decided medical risk" to his health. 1998 & 2002 Manuals § 3302(b)(1). He observed that "by maintaining [Mr. Hassay's] status as a reservist, his diagnosis of PTSD . . . worsened and his symptoms also worsened." AR 153. In Dr. Foote's view, "[h]ad he been discharged at the time when [he] was asking for some form of help due to his emotional state in 1999, he may have had a more positive and productive life." Id.; see also id. (observing that "keeping [Mr. Hassay] on the reserve status with active duty weekends[,] . . . compromised him even more and created more severe problems for him not only while he was in service but more so when he was released from his military duty").

Dr. Foote's opinion is no less relevant because it is based on his treatment of Mr. Hassay many years after he left the service. See Walters v. United States, 358 F.2d 957, 962 (Ct. Cl. 1966) (observing that subsequent medical evidence is not only relevant, but can be vitally important for conditions that are "difficult to . . . diagnose and may not be discovered for a number of years after the occurrence of the traumatic injury which is alleged to have precipitated it"). In fact, as the Department of Defense has recently recognized, because disorders like PTSD were until recently not well understood, they are often not diagnosed until many years after they manifest themselves. See, e.g., Memorandum for Secretaries of the Military Departments from Secretary of Defense Charles Hagel, Supplemental Guidance to Military Boards for Correction of Military/Naval Records Considering Discharge Upgraded Requests by Veterans Claiming Post Traumatic Stress Disorder (Sept. 3, 2014), App. to Pl's Cross-MJAR Ex. 1, at A1.

Further, in this case, the post-discharge opinions before the Board were not inconsistent with the medical reports prepared during Mr. Hassay's service. As described above, in 1999, Mr. Hassay sought a mental health consultation because he suffered symptoms of significant depression as well as relationship stress. The examining physician, Dr. Killian, documented Mr. Hassay's "history of depression [and] Bipolar disorder," and his then-current complaints of "disturbed sleep, disinterest, [increased] guilt over recent relationship, [decreased] concentration, [and decreased] appetite." AR 99. While Dr. Killian noted that Mr. Hassay had "no active [suicidal ideation] or [homicidal ideation]," it appears that he may have had concerns about whether Mr. Hassay might be a suicide risk. Id. Thus, Dr. Killian directed not only that Mr. Hassay receive follow-up care at the mental health clinic the following week, but also that he enter into a "contract for safety" covering the period until then. Similarly, when another Navy doctor examined Mr. Hassay the following year, Mr. Hassay again reported that he "had multiple stressors" in his life and told the doctor that he wanted to receive mental health counseling. Id. at 226.[12]

---

[12] The government states that Dr. Killian's examination, as well as the examination conducted in 2000 "found no indication that Mr. Hassay was unable to perform his duties." Def.'s Reply at 17 (citing AR 99, 226–27). Further, it asserts that "[t]he examinations noted certain psychological issues," but that they "also made clear that, according to Mr. Hassay, the stressors causing those psychological issues were related to his personal life, not his naval service." Id.

Further, according to the decision of the Board of Veterans Appeals, Mr. Hassay was hospitalized for depressive disorder in August of 2002—just a few months after his discharge. See AR 160 (decision of the Board of Veterans Appeals). The Board of Veterans Appeals references "[p]ost-service treatment records" related to this hospitalization, but those records were not provided to the BCNR. And while the BCNR did have the decision of the Board of Veterans Appeals before it on reconsideration, neither the Board nor its Senior Medical Advisor made any mention of the hospitalization referenced in the decision.

The Board's conclusion that Mr. Hassay's "service[-]connected disability conditions" did not "create[] a sufficient occupational impairment to warrant [Mr. Hassay's] referral to a medical board or the Physical Evaluation Board" in 1999 or 2000 is also not supported by substantial evidence. AR 6. The Navy's regulations provide that when "members present[] for medical care whose physical or mental fitness to continue naval service is questionable," "individual medical . . . officers" are required to "promptly identify" them "for evaluation by Medical Boards and appropriate referral to the [Physical Evaluation Board]." 1998 & 2002 Manuals § 1005. As previously described, Dr. Killian apparently thought Mr. Hassay's mental health issues sufficiently serious to have him sign a "safety contract," in which Mr. Hassay presumably agreed not to harm himself before his follow up appointment the next week. He also provided Mr. Hassay with emergency contact numbers that he might use in the interim. The Board did not explain its reason for determining that—at the time Dr. Killian examined him—Mr. Hassay's "mental fitness to continue naval service" was not "questionable." Id.

Dr. Foote, in fact, opined that the Navy medical staff that dealt with mental health care, including Dr. Killian, may have dropped the ball when it came to Mr. Hassay's care. The Court therefore agrees with Mr. Hassay that—to the extent that the Navy violated its own regulations by not referring him to the Disability Evaluation System—it should not be permitted to rely on

---

These contentions are not supported by the record. Neither Dr. Killian nor the physician who examined Mr. Hassay in 2000 made any determination one way or the other about his fitness to perform his duties. Moreover, neither physician offered an opinion about the causes of his mental health issues. To be sure, Dr. Killian remarked that Mr. Hassay was distressed by a recent break-up with his long-time girlfriend. But the report does not purport to determine (much less quantify) the role that the break-up (as opposed to another trigger) played in causing mental illness. In fact, the Department of Defense has recognized that relationship problems are often symptoms rather than causes of PTSD. Memorandum for Secretaries of the Military Departments from Under Secretary of Defense Anthony Kurta, Clarifying Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Considering Requests by Veterans for Modification of their Discharge Due to Mental Health Conditions, Sexual Assault, or Sexual Harassment (August 25, 2017), App. to Pl's Cross-MJAR Ex. 2, at A6 ¶ 5; see also AR 121 (attachment to Mr. Hassay's application for reconsideration to the BCNR) (screenshot of webpage entitled Relationships and PTSD, from the National Center for PTSD on the website of the United States Department of Veterans Affairs) ("Trauma survivors with PTSD may have trouble with their close family relationships or friendships.").

the absence of contemporaneous evidence that Mr. Hassay's mental illness made him unfit for service.[13]

Adding to the Court's concerns about the Board's lack of care is the Board's observation that Mr. Hassay "provided evidence that [he] failed to meet Army accession standards in 1998 due to psychological and musculoskeletal reasons." AR 101; see also id. at 160 (VA decision noting that "there is evidence that a transfer to the Army was rejected due to a psychiatric disorder"); id. at 146 (letter from the OIG, describing Mr. Hassay's "permanent medical disqualification" as being for "(3P) for Spine, other Musculoskeletal/Psych"). The Court is unsure whether the Board's interpretation of the relevant document (a computer printout) is correct because, as the government notes, the failure code set forth in that document reads as follows: "SPINE, OTHER MUSCULOSKELETAL/Psych left open." Def.'s Cross-MJAR at 12 (quoting AR 223). Among other things, given that the Army found that Mr. Hassay did not meet its accession standards based on "spinal" or "other musculoskeletal" issues, the Court does not know what meaning it should ascribe to the Army's decision to also specify that "Psych" had been "left open." AR 223. But assuming the Board's interpretation was accurate, then one would have expected the Board to take into account the Army's finding that Mr. Hassay did not meet accession standards related to his mental health in deciding Mr. Hassay's fitness for duty.[14]

The BCNR's decisions also reflect no consideration of the risks that the sexual and physical assaults Mr. Hassay suffered posed to his health as his service continued. Indeed, it is unclear whether the Board even credited as true Mr. Hassay's allegations of assault and threats. In its initial decision, the Board stated that "no evidence [supported Mr. Hassay's] assertion of an assault by [his] Command Master Chief or military sexual trauma." AR 101. The Board seems to have abandoned this finding on reconsideration (although it did not do so explicitly). Nonetheless, to the extent that it no longer discredited Mr. Hassay's allegations, it appears that it considered them relevant only to whether Mr. Hassay's mental illness was service connected. Its

---

[13] The Court notes, however, that it is not persuaded by Mr. Hassay's contention that the Manual "expressly identifies Mr. Hassay's service-connected mental illness and back disability as conditions 'which are cause for referral into the Disability Evaluation System (DES).'" Pl.'s Cross-MJAR at 30–31 (quoting 1998 & 2002 Manuals at §§ 8001, 8002, 8013). As the government observes, the quoted provision is an introductory paragraph to a list of conditions that may warrant referral to the Disability Evaluation System. But such referral is required only if the conditions cause the member to be unfit to perform his duties. See 1998 & 2002 Manuals §§ 3202(c), 8001(a)(2), 8001(e).

[14] The Court, however, does not believe that the current administrative record is sufficient to show that the Navy violated its regulations when it did not refer Mr. Hassay to the Disability Evaluation System after the Army denied his request to transfer. Specifically, there is no evidence in the record that the Army ever informed the Navy that Mr. Hassay had failed to meet Army accession standards. The Court takes note of Mr. Hassay's point that relevant regulations required that this information be shared with the Navy. Nonetheless, the Court is not persuaded that an appropriate consequence of the failure to do so would be to impute knowledge of the Army's determination to the Navy for purposes of deciding whether the Navy was obligated to refer Mr. Hassay to the Disability Evaluation System in 1998.

decision reflects no consideration of the relationship between the disturbing incidents Mr. Hassay alleges occurred and his fitness for duty. Yet those events would appear to give credence to Mr. Hassay's contentions (and the opinions of his treating psychiatrist) regarding the adverse effects of his continued service on his mental health.

Finally, the Court agrees with Mr. Hassay that the BCNR decision does not reflect adherence to the principles set forth in three DoD directives on military sexual trauma and PTSD, including: 1) Secretary of Defense Charles Hagel's 2014 memorandum entitled "Supplemental Guidance to Military Boards for Correction of Military/Naval Records Considering Discharge Upgraded Requests by Veterans Claiming Post Traumatic Stress Disorder" ("Hagel Memo"), App. to Pl.'s Cross-MJAR Ex. 1; 2) Under Secretary of Defense Anthony Kurta's 2017 memorandum entitled "Clarifying Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Considering Requests by Veterans for Modification of their Discharge Due to Mental Health Conditions, Sexual Assault, or Sexual Harassment" ("Kurta Memo"), id. Ex. 2; and 3) Under Secretary of Defense Robert L. Wilkie's 2018 memorandum entitled "Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Regarding Equity, Injustice, or Clemency Determinations" ("Wilkie Memo"), id. Ex. 3.[15]

The Hagel, Kurta, and Wilkie Memos reflect a commitment within the military to "ensure[] fair and consistent standards of review" for veterans with mental illness, PTSD, or who have experienced a military sexual trauma. Kurta Memo A5. The government conceded at oral argument that Mr. Hassay's request for a change in his discharge status related to his mental health status, PTSD, and military sexual trauma is covered by the terms of the guidance, and that the guidance was binding on the BCNR. Oral Arg. Tr. 16:21–17:8, ECF No. 34; see, e.g., Kurta Memo A8 ¶ 20 (explaining that in requests for discharge relief reviewed by the BCNR, "the term 'discharge' includes the characterization, narrative reason, separation code, and re-enlistment code"); id. ¶ 24 ("These guidance documents are not limited to Under Other Than Honorable Condition discharge characterizations but rather apply to any petition seeking discharge relief including requests to change the narrative reason [and] re-enlistment codes."); AR 6 (BCNR decision on reconsideration) (describing that Mr. Hassay requested the BCNR to place him "on the disability retirement list or have [his] narrative reason for separation changed to disability"); AR 16 (recommendation of the Senior Medical Advisor to the BCNR) (explaining that Mr. Hassay petitioned the BCNR to change "the Narrative Reason for Separation at the time of his 25 May 2002 discharge . . . from Expiration of Reserve enlistment to placement on the Permanent Disability Retired List").

The memos required the Board to consider a number of principles in reviewing Mr. Hassay's arguments. The Kurta Memo, for example, requires the BCNR to give "[l]iberal

---

[15] The government contends that Mr. Hassay never asserted at the BCNR that it should grant liberal consideration to his claim pursuant to the memoranda, thus waiving this argument before the Court. Def.'s Reply at 20 (citing Metz v. United States, 439 F.3d 991, 997 (Fed. Cir. 2006)). This argument lacks merit. Waiver does not apply where the error a party seeks to challenge before the Court was committed by the Board itself, rather than an error committed by the agency whose action the Board is reviewing.

consideration . . . to veterans petitioning for discharge relief when the application for relief is based in whole or in part on matters relating to mental health conditions, including PTSD; [or] sexual assault." Kurta Memo A6 ¶ 3. "Liberal consideration," the memo explains, means that it would be "unreasonable to expect the same level of proof for injustices committed years ago when . . . mental health conditions, such as PTSD; and victimology were far less understood than they are today," id. at A8 ¶ 26(b), and that "[m]ental health conditions, including PTSD; [and] sexual assault . . . impact veterans in many intimate ways, are often undiagnosed or diagnosed years afterwards, and are frequently unreported," id. at A9 ¶ 26(d); see also id. at A5 (observing that in light of the "unique nature" of cases involving sexual assault, "there are frequently limited records for the [BCNR] to consider," and that the BCNR should "afford each veteran a reasonable opportunity for relief even if the sexual assault . . . was unreported or the mental health condition was not diagnosed until years later"); Hagel Memo A3 (stating that "[i]n cases where Service records or any document from the period of service substantiate the existence of one or more symptoms of what is now recognized as PTSD or a PTSD-related condition during the time of service, liberal consideration will be given to finding that PTSD existed at the time of service").

The Kurta Memo also makes clear that evidence of PTSD or sexual assault "may come from sources other than a veteran's service record." Kurta Memo at A6 ¶ 4. Particularly relevant here (but apparently not considered by the Board) are sources that include: "requests for transfer to another military duty assignment;" "episodes of depression," and "relationship issues." Id. ¶ 5. Additionally, the "veteran's testimony alone, oral or written, may establish the existence of a condition or experience, that the condition or experience existed during or was aggravated by military service, and that the condition or experience excuses or mitigates the discharge." Id. at A7 ¶ 7; see also Wilkie Memo A12 ¶ 6(e). The Board, however, apparently did not have before it the transcript of Mr. Hassay's testimony before the Board of Veterans Appeals, which described the assaults and harassment he allegedly suffered aboard the USS Sides.[16]

Further, the Board's decision reflects no consideration of the principle that "[a] determination made by the [VA] that a veteran's mental health condition, including PTSD; . . . sexual assault; or sexual harassment is connected to military service, while not binding on the Department of Defense, is persuasive evidence that the condition existed or experience occurred during military service." Kurta Memo at A7 ¶ 14; see also Hagel Memo at A3 ("Special consideration will be given to [VA] determinations which document PTSD or PTSD-related conditions connected to military service."). And the Kurta Memo further provides that "[a] diagnosis made by a licensed psychiatrist or psychologist that [a mental health] condition existed during military service will receive liberal consideration." Kurta Memo A7 ¶ 13.

In short, the Board's decision does not reflect that it took into account the principles outlined in these memoranda. For this reason as well, its decision was arbitrary, capricious, and contrary to law.

---

[16] Mr. Hassay seeks to introduce this transcript into the record before the Court in his motion to supplement and correct the record. App. to Pl.'s Mot. to Suppl. Ex. 2.

**CONCLUSION**

Based on the foregoing, Mr. Hassay's motion for judgment on the administrative record is **GRANTED** and the government's motion is **DENIED**.

With respect to relief, the Tucker Act states that "[t]o provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing . . . placement in appropriate duty or retirement status, and correction of applicable records." 28 U.S.C. § 1491(a)(2). It also has the authority "to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." Id.

The Court is cognizant of the fact that decisions regarding military matters, including fitness for duty, are best made by military authorities. Fisher v. United States, 402 F.3d 1167, 1177 (Fed. Cir. 2005). It therefore concludes that the appropriate course of action here is to remand this matter to the BCNR for its reconsideration of Mr. Hassay's claims, consistent with this opinion. Mr. Hassay is now represented by counsel, and a remand will give him the opportunity to put additional evidence before the Board that is not currently in the administrative record.

Therefore, the Court **REMANDS** the case to the BCNR for reconsideration of Mr. Hassay's claims: 1) that the Navy should have referred him to an MEB in August of 1999 when Dr. Killian examined him or in 2000 when he requested mental health counseling; and 2) that he was unable to reasonably perform the duties of his office, grade, rank, or rating as early as 1998 or as late as the time of his discharge. In conducting its review, the Board shall, consistent with this opinion:

1. decide whether and when Mr. Hassay's continuation on Active Reserve status presented "a decided medical risk" to his health or the welfare of other members, 1998 & 2002 Manuals § 3302(b)(1);

2. evaluate and consider all medical and other evidence Mr. Hassay presents, giving appropriate weight to the letters from the mental health professionals who have treated him in the years following his discharge; and

3. apply the DoD guidance cited above, concerning service members with PTSD or mental health conditions or who have experienced a military sexual trauma, in considering Mr. Hassay's claims and the relevant medical and other evidence.

On remand, Mr. Hassay should be permitted to introduce the evidence that is the subject of his motion to supplement the administrative record, as well as any other evidence relevant to the issues before the Board. Therefore, Mr. Hassay's motion to supplement and correct the administrative record, ECF No. 24, is **DENIED** as moot.

The remand proceedings must be completed within six months of the date of this decision. The parties shall file a joint report every sixty days advising the Court of the status of the proceedings on remand.

The Court will retain jurisdiction over the case during the course of the proceedings on remand. The Court **STAYS** proceedings in the instant case during that time.

Pursuant to Rule 52.2(e) of the Court of Federal Claims, the parties shall file notice with the Court within thirty days of the Board's decision on remand stating whether that decision affords a satisfactory basis for the disposition of the case and whether the parties require further proceedings before the Court.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge