# In the United States Court of Federal Claims

|  |  |
|---|---|
| AARON HASSAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 19-594C |
| v. ) | (Filed: January 27, 2025) |
| ) | |
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

Joshua D. Schnell, Rhina M. Cardenal, Cordatis LLP, Arlington, VA, for Plaintiff.

Robert R. Kiepura, Trial Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were Andrei Kouzema, of Counsel, Captain, U.S. Marine Corps, General Litigation Division, Office of the Judge Advocate General, Department of the Navy, Washington, DC, Douglas K. Mickle, Assistant Director, Patricia M. McCarthy, Director.

**OPINION AND ORDER**

**KAPLAN, Chief Judge.**

    The plaintiff in this military disability retirement case, Aaron Hassay, served in the United States Navy Reserves ("USNR") for eight years, from 1994 to 2002. He claims he is entitled to a military disability retirement based on post-traumatic stress disorder ("PTSD") and other psychiatric illnesses that either developed during, or were aggravated by, his military service. According to Mr. Hassay, these conditions rendered him "unfit to perform the duties of his office, grade, rank or rating" during his service. See Hassay v. United States, 150 Fed. Cl. 467 (2020) [hereinafter Hassay I]; see also 10 U.S.C. § 1204. After two remands to the Board for the Correction of Naval Records ("the Board" or "the BCNR"), the case is before the Court for the third time on the government's motion to dismiss under RCFC 12(b)(1), and the parties' cross-motions for judgment on the administrative record. See Pl.'s Mot. J. Admin. R., ECF No. 73 [hereinafter "Pl.'s Mot"]; Def.'s Mot. to Dismiss and Cross-Mot. J. Admin. R., ECF No. 78 [hereinafter "Def.'s Mot."].

    For the reasons set forth below, the Court rejects the government's argument that Mr. Hassay's claims are barred by the Tucker Act's six-year statute of limitations. 28 U.S.C. § 2501. It therefore **DENIES** the government's motion to dismiss. However, the Court finds that the BCNR decision under review is consistent with law and is supported by substantial evidence. Therefore, it **GRANTS** the government's motion for judgment on the administrative record.

**BACKGROUND**

I.  **Mr. Hassay's Claims**

The facts and background of this case are discussed in detail in this Court's opinion in Hassay I and in its subsequent order granting the parties' joint motion to remand the case for consideration in light of the court of appeals' decision in Doyon v. United States, 58 F.4th 1235 (Fed. Cir. 2023). Remand Order, ECF No. 65. The Court assumes familiarity with the matters described in its earlier opinions and will provide additional details only as necessary to explain its resolution of the motions currently before it.

To summarize, Mr. Hassay served in the United States Navy Reserves from 1994 until he was honorably discharged in 2002 at the conclusion of his eight-year term. Hassay I, 150 Fed. Cl. at 470. From October 1995 through January 1999, Mr. Hassay was assigned to the U.S.S. Sides, a guided missile frigate. Id. During that assignment, Mr. Hassay served alongside active-duty seamen two weekends a month, and also served some multi-week deployments. Id. According to Mr. Hassay, during that service he was a victim of an attempted sexual assault, physically threatened twice (once with a knife and on another occasion with a gun), physically assaulted and beaten by the Command Master Chief of the vessel, and frequently subject to verbal abuse. Id. at 470–71.

Mr. Hassay alleges that as a result of these incidents he developed PTSD and aggravated other pre-existing mental health conditions. Pl.'s Mot. at 10. He further claims that he was unfit to reasonably perform the duties of his office, grade, rank, or rating as a result of the disorders. See id. at 30–31.

Mr. Hassay argues that under SECNAVINST 1850.4E, encl. 3, § 1005, the Navy was required to refer him for evaluation by a Medical Evaluation Board ("MEB") because, on several occasions during his service, his fitness to continue to serve was at least "questionable." Pl.'s Mot. at 21–27. In addition, Mr. Hassay argues that the Board's decision finding that he was not unfit for duty at any time during his service was arbitrary and capricious. Id. at 4, 26. According to Mr. Hassay, the Board placed excessive reliance on his positive or at least satisfactory performance evaluations. Id. at 3–4, 28–30. In addition, he argues that the Board failed to give sufficient weight to the opinion of his treating psychiatrist, Dr. William Foote, which Mr. Hassay claims established that his continued service posed a "decided medical risk to his health." Id. at 31–35; see SECNAVINST 1850.4E, encl. 3, § 3302(b)(1).

II.  **The Board's First Decision**

As recounted in some detail in Hassay I—after his 2002 discharge, the symptoms of Mr. Hassay's mental disorders worsened and he experienced poverty and homelessness. 150 Fed. Cl. at 472. In 2005, Mr. Hassay was determined eligible to receive Social Security disability benefits based on his "affective (mood) disorder and anxiety disorder." Admin. R. ("AR") Vol. III at 111, ECF No. 12-3. Thereafter, in 2016, the Department of Veterans Affairs ("VA") awarded Mr. Hassay disability benefits based on a service-connected "acquired psychiatric disorder." AR Vol. II at 66–81, ECF No. 12-2.

2

Also in 2016, Mr. Hassay petitioned the BCNR to correct his naval records to reflect a disability retirement. AR 262. The Board rejected Mr. Hassay's request. AR 101–02. It found that Mr. Hassay had a mental health disorder as early as 1998, but concluded there was insufficient evidence to establish that his condition "was incurred or aggravated in connection with [his] military service." AR 101. It also found that there was insufficient evidence to support Mr. Hassay's assertions that he was assaulted by his Command Master Chief or that he was a victim of military sexual trauma. Id. Finally, the Board concluded that the evidence did not establish that Mr. Hassay was unfit for continued service at the time of his discharge. AR 102.

On December 6, 2016, Mr. Hassay asked the Board to reconsider its decision based on an intervening decision by the Board of Veterans Appeals that found—contrary to the BCNR—that Mr. Hassay's psychiatric disorders were service-connected. AR 103–04. The BCNR denied reconsideration in a February 2018 decision, but now acknowledged that Mr. Hassay had "service[-]connected disability conditions." AR Vol. I at 6–7, ECF No. 12-1. However, it remained of the view that these conditions had not "created a sufficient occupational impairment to warrant [Mr. Hassay's] referral to a medical board or the Physical Evaluation Board ["PEB"]" and that the record showed that he was fit for duty at the time of his discharge. Id. The Board concurred with the opinion of its Senior Medical Advisor and relied on Mr. Hassay's performance evaluations, which the Board found showed that he was "fit for duty at the time of [his] discharge despite the evidence that [his] symptoms may have worsened in the years after his discharge." Hassay I, 150 Fed. Cl. at 476 (alterations in original) (quoting AR 7).

### III.   The Court's Decision in Hassay I

After the BCNR rejected his request for reconsideration, Mr. Hassay filed suit here. Compl., ECF No. 1. On October 16, 2020, the Court remanded the case to the Board. Hassay I, 150 Fed. Cl. at 484–85. It held that the Board had failed to consider certain criteria prescribed by the Navy's Disability Evaluation Manual when determining that Mr. Hassay was not unfit for duty at any point during his service. Id. at 479. In particular, the Court concluded that the BCNR had failed to apply the instructions set forth in SECNAVINST 1850.4E, encl. 3, § 3302. Id. Those instructions provide that among the criteria the Navy may consider when making a fitness determination is whether a service member's continued service at the time of his discharge or in the preceding years presented "a decided medical risk" to his health. Id. (quoting SECNAVINST 1850.4E, encl. 3, § 3302(b)(1)). The Court found that the BCNR erred by failing to consider certain evidence in the record concerning the potential medical risks posed to Mr. Hassay by continued service, particularly the opinions of Mr. Hassay's treating psychiatrist, Dr. Foote. Id. at 480–81.

The Court also determined that in assessing Mr. Hassay's claims, the BCNR had failed to apply the principles set forth in certain Department of Defense ("DoD") guidance on military sexual trauma and PTSD, including a 2014 memorandum from Secretary of Defense Charles Hagel entitled "Supplemental Guidance to Military Boards for Correction of Military/Naval Records Considering Discharge Upgrade Requests by Veterans Claiming Post Traumatic Stress Disorder" ("Hagel Memo"); a 2017 memorandum from the Acting Under Secretary of Defense Anthony Kurta entitled "Clarifying Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Considering Requests by Veterans for Modification of their Discharge Due to Mental Health Conditions, Sexual Assault, or Sexual Harassment"

3

("Kurta Memo"); and a 2018 memorandum from Under Secretary of Defense Robert L. Wilkie entitled "Guidance to Military Discharge Review Boards and Boards for Correction of Military/Naval Records Regarding Equity, Injustice, or Clemency Determinations" ("Wilkie Memo"). See Hassay I, 150 Fed. Cl. at 483–84.

The Court remanded the case to the Board with the following instructions: 1) decide whether Mr. Hassay's continued performance of his duties as a reservist presented "a decided medical risk" to his health or the welfare of other members; 2) evaluate and consider all medical and other evidence, giving appropriate weight to the opinions of the mental health professionals who treated Mr. Hassay in the years following his discharge; and 3) apply the DoD guidance concerning service members with PTSD and other mental health conditions or who have experienced a military sexual trauma. Id. at 485 (quoting SECNAVINST 1850.4E, encl. 3, § 3302(b)(1)).

## IV.     The Board's Decision on Remand from Hassay I

The BCNR issued its decision on remand from Hassay I on June 1, 2021. AR Suppl. Vol. I at 2313–23, ECF No. 70-1. It again denied Mr. Hassay's application, finding that there was insufficient evidence that Mr. Hassay was unfit to perform his duties at any time during his service. See AR 2322. In particular, it rejected Mr. Hassay's reliance on the views of his treating psychiatrist, Dr. Foote, who opined that Mr. Hassay's continued service represented a decided medical risk to his health. AR 2321. The Board reasoned that Dr. Foote's opinion was not supported by objective evidence. Id.

## V.     The Court Remands the Case a Second Time

After the Board issued its decision on remand, the Court set a briefing schedule for cross-motions for judgment on the administrative record. Order, ECF No. 48. Shortly thereafter, however, the government filed and the Court granted an unopposed motion to stay the proceedings pending a final decision by the Federal Circuit in Doyon v. United States. Def.'s Mot. to Stay, ECF No. 58; Order, ECF No. 59.

On January 25, 2023, the court of appeals issued its decision. It held that the "liberal consideration" standard of review described in the Kurta Memo, which was codified in 10 U.S.C. § 1552(h), applied to requests that records be corrected to reflect a service member's entitlement to disability retirement. Doyon, 58 F.4th at 1248.[1] This Court then granted the parties' request

---

[1] Section 1552(h) of Title 10 applies "to a former member of the armed forces whose claim under this section for review of a discharge . . . is based in whole or in part on matters relating to post-traumatic stress disorder . . . as supporting rationale . . . and whose post-traumatic stress disorder . . . is related to combat or military sexual trauma, as determined by the Secretary concerned." It provides that corrections boards must review the claims of such individuals with "liberal consideration to the claimant that post-traumatic stress disorder . . . potentially contributed to the circumstances resulting in the discharge or dismissal or to the original characterization of the claimant's discharge or dismissal."

4

that Mr. Hassay's claims be remanded to the Board again, this time for reconsideration in light of Doyon. Remand Order, ECF No. 65.

## VI. The Board Decision Under Review

On remand, the Board acknowledged that it was required to give liberal consideration to Mr. Hassay's claims in accordance with the Kurta Memo because Mr. Hassay sought relief on the basis of the effects of military sexual trauma and PTSD. AR 2290. The Kurta Memo states that a veteran's testimony alone may establish that they experienced a mental health condition, sexual assault, or sexual harassment. Pl.'s Mot. Ex. 2 ("Kurta Memo") at A7, ECF No. 73. Consistent with that principle, the Board credited Mr. Hassay's allegations of military sexual trauma on the basis of his statements alone and notwithstanding that he had not reported the incidents of abuse when he sought mental health treatment during service and for many years thereafter. Id. It also accepted as true Mr. Hassay's claims that the sexual and other assaults that he experienced on the USS Sides either triggered or exacerbated his psychiatric disorders, including PTSD. AR 2291.

The Board concluded, however, that "the objective contemporary evidence overwhelmingly established that [Mr. Hassay] did not meet the criteria for referral to the [Disability Evaluation System ("DES")] and that [he was] fully capable of performing the duties of [his] office, grade, rank, or rating, and [that he] provided almost no credible evidence to counter it." Id. The Board acknowledged that under SECNAVINST 1850.4E, encl.3, § 1005, "line commanders, commanding officers of [military treatment facilities], and individual medical and dental officers" are required to refer members who present for medical care to the DES where their "physical or mental fitness to continue naval service is questionable." AR 2292 (alteration in original). However, it found insufficient evidence that Mr. Hassay's continued service "was ever questionable due to any mental health conditions," or "that [his] ability to fully perform [his] military duties was ever in doubt, or that [his] continued service may have compromised [his] health or well-being." Id. It therefore rejected his application for correction of his records to reflect a disability retirement.

## DISCUSSION

## I. The Government's Motion to Dismiss for Lack of Subject-Matter Jurisdiction

As explained in Hassay I, this Court has jurisdiction under the Tucker Act to hear military disability retirement claims because sections 1201 and 1204 of Title 10 of the United States Code—which govern such retirement—are money-mandating statutes. Hassay I, 150 Fed. Cl. at 477 (citations omitted). In its motion to dismiss, however, the government argues (for the first time) that the Court lacks jurisdiction over Mr. Hassay's claims because he filed them more than six years after they accrued. See 28 U.S.C. § 2501 (stating that "[e]very claim of which the United States Court of Federal Claims has jurisdiction" must be "filed within six years after such claim first accrues"); see also Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576–77 (Fed. Cir. 1988) (observing that the six-year limitations period "is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed").

5

Where—as here—the government alleges that the plaintiff failed to timely file his claim, the burden is on the plaintiff to show by preponderant evidence that his claim was filed within the statutory limitations period. See Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). For the reasons set forth below, the Court finds that Mr. Hassay has met that burden and that the government's arguments lack merit.

A Tucker Act claim accrues "as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, i.e., when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'" Chambers v. United States, 417 F.3d 1218, 1223 (Fed. Cir. 2005) (quoting Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003)). "[C]laims of entitlement to disability retirement pay generally do not accrue until the appropriate military board either finally denies such a claim or refuses to hear it." Id. at 1224. That is because "Congress has entrusted the military boards with the task of determining whether a serviceman should be retired for disability and therefore no cause of action arises (and the statute of limitations does not run) until a proper board has acted or declined to act." Friedman v. United States, 310 F.2d 381, 389 (Ct. Cl. 1962); see also Jones v. United States, 30 F.4th 1094, 1100 (Fed. Cir. 2022) (Under the "first competent board rule" applicable to disability retirement cases, "a service member's claim does not accrue until final action is taken by the first board competent to decide the matter of entitlement, or upon refusal of a service member's request for such a board.").

In this case, Mr. Hassay did not request review by a competent board before his discharge in 2002. Nor did a competent board consider, or refuse to consider, Mr. Hassay's entitlement to disability retirement until November 2016, when the BCNR denied his claim.

The government argues that the Navy nonetheless "affirmatively considered the question of Mr. Hassay's fitness for duty when it assigned him [an] 'RE-1' re-entry code, meaning that he was 'fully eligible for reenlistment' and did not require any medical waivers." Def.'s Mot. at 8 (citing AR 387). This contention is unpersuasive. The mere assignment of a re-entry code is not equivalent to a statutory board's consideration of a service member's fitness for duty or eligibility for disability retirement. See Strahler v. United States, 158 Fed. Cl. 584, 591–92 (2022) (finding that a corrections board was the first statutory board to address the plaintiff's disability retirement claim, even though the plaintiff was assigned a re-entry code allowing reenlistment).

The Court is also not persuaded by the government's argument that Mr. Hassay's claim for disability retirement accrued when he was discharged because at that point he had "sufficient actual or constructive notice of his disability, and hence, of his entitlement to disability retirement pay." Chambers, 417 F.3d at 1226 (citing Real v. United States, 906 F.2d 1557, 1562 (Fed. Cir. 1990)); see Def.'s Mot. at 7–10. As the court of appeals has explained, this exception to the first competent board rule applies where a service member "knew [at the time of discharge] that he was entitled to disability retirement due to a permanent disability that was not a result of his intentional misconduct and was service-connected." Chambers, 417 F.3d at 1226.

There is no evidence in the record that Mr. Hassay knew at the time of his discharge that he had any permanent service-connected psychiatric disorder. Nor is there evidence that he should have known that his psychiatric illnesses were permanent in nature. Indeed, as described

6

in greater detail below, even the military doctors who examined Mr. Hassay in 1999 and 2000 did not diagnose PTSD, and they attributed his depression and related symptoms to circumstantial stressors. See Hassay I, 150 Fed. Cl. at 471–72. Moreover, nothing in the record suggests that Mr. Hassay consulted any non-military medical providers, received any non-military mental health care, or otherwise questioned the assessments of his military physicians.

To be sure, the record shows that Mr. Hassay knew that he was experiencing symptoms of depression and psychological distress during his service because he reported it to the Navy medical providers who examined him. But that knowledge did not trigger the running of the statute of limitations. As the Court of Claims observed in Friedman, 310 F.2d at 402, "veterans who never applied for a Retiring Board because they . . . did not appreciate the progressive or serious character of their disease or disability will not be cut off by limitations from pursuing their late-discovered claim before the Correction Board and this court." See also Strahler, 158 Fed. Cl. at 592 (reiterating that the exception to the first competent board rule is not applicable unless the service member knows that the impairment is permanent and that it renders him unfit to perform the duties of his position). And it would seem particularly inappropriate to attribute to a veteran the knowledge that he was suffering from PTSD given the fact that the condition itself inflicts what the Kurta Memo characterized as "invisible wounds" that may not be diagnosed for years after they first manifest. Kurta Memo at A5.

In short, Mr. Hassay's claim for disability retirement accrued in 2016, when the BCNR issued its first decision. Therefore, this lawsuit was timely filed, and the Court has subject-matter jurisdiction over Mr. Hassay's complaint.

## II.     The Cross-Motions for Judgment on the Administrative Record

### A.     Standard of Review

The Court of Federal Claims reviews decisions of military correction boards based on the administrative record. See, e.g., Walls v. United States, 582 F.3d 1358, 1367 (Fed. Cir. 2009). It applies a deferential standard of review that is "limited to determining whether a decision of the Correction Board is arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations." Melendez Camilo v. United States, 642 F.3d 1040, 1044 (Fed. Cir. 2011) (quoting Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983)); see also Chappell v. Wallace, 462 U.S. 296, 303 (1983) (establishing that a decision of the Board for the Correction of Naval Records is "subject to judicial review" and may be set aside if it is "arbitrary, capricious or not based on substantial evidence").

"An agency's decision is arbitrary and capricious when the agency decision-maker 'entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Kelly v. United States, 69 F.4th 887, 894–95 (Fed. Cir. 2023) (alterations in original) (quoting Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). The application of the arbitrary and capricious standard "does not require a reweighing of the evidence, but a determination whether the conclusion being reviewed is supported by substantial evidence," Heisig, 719 F.2d at 1157, i.e., by "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion," Strand v. United States, 951 F.3d 1347, 1351 (Fed. Cir. 2020) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)).

In reviewing a correction board decision, the Court may not "substitute [its] judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." Heisig, 719 F.2d at 1156. This principle is particularly important in the context of fitness determinations, where concerns about justiciability have led reviewing courts to caution that "responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province." Id.

**B.  Merits**

As noted above, in the decision currently under review the Board found despite the absence of corroborating evidence that Mr. Hassay was a victim of sexual and physical assault as well as verbal abuse while serving on the U.S.S. Sides. It also found that as a result of these experiences, Mr. Hassay developed PTSD and aggravated his pre-existing mental health conditions, including depression and bipolar disorder.

These findings reflect that the Board applied liberal consideration to Mr. Hassay's claims that he developed PTSD as a result of military sexual trauma, consistent with the principles set forth in the DoD guidance and with the Court's remand instructions. The Kurta Memo, for example, instructs that "[i]t is unreasonable to expect the same level of proof for injustices committed years ago when . . . mental health conditions, such as PTSD; and victimology were far less understood than they are today," or "to expect the same level of proof for injustices committed years ago when there is now restricted reporting, heightened protections for victims, greater support available for victims and witnesses, and more extensive training on sexual assault and sexual harassment than ever before." Kurta Memo at A8–A9. The memorandum also states that "[m]ental health conditions, including PTSD; [traumatic brain injury]; sexual assault; and sexual harassment impact veterans in many intimate ways, are often undiagnosed or diagnosed years afterwards, and are frequently unreported. Id. at A9.

The Board nonetheless concluded that Mr. Hassay was not entitled to a disability retirement. It concluded that "the objective contemporary evidence overwhelmingly established that [Mr. Hassay] did not meet the criteria for referral to the DES" at any point during his service and that Mr. Hassay was "fully capable of performing the duties of [his] office, grade, rank, or rating" during his service. AR 2291.

Mr. Hassay challenges both of these conclusions. He alleges that they are not supported by substantial evidence. He also contends that the Board failed to apply liberal consideration to his claims as required by the DoD guidance.

The Court disagrees. The Board followed the Court's remand instructions, considered and applied the DoD guidance as well as the other relevant agency issuances, and provided a detailed explanation of its reasoning. Its decision was based on consideration of the record as a whole and supported by substantial evidence. Under these circumstances, the Court cannot second-guess the agency's judgment, even if the Court might have reached a different conclusion on its own. It will therefore **GRANT** the government's motion for judgment on the administrative record.

### 1. The Board's Ruling that the Navy Had No Obligation to Refer Mr. Hassay to a Medical Evaluation Board at Any Point During His Service

As described above and in Hassay I, SECNAVINST 1850.4E encl. 8, § 8001(e) states that "[a]ny condition that appears to significantly interfere with performance of duties appropriate to a service member's office, grade, rank or rating will be considered for "MEB" evaluation." See 150 Fed. Cl. at 478. SECNAVINST 1850.4E encl. 1, § 1005 further provides that when "members present[] for medical care whose physical or mental fitness to continue naval service is questionable," "line commanders, commanding officers[,] and individual medical and dental officers" are required to "promptly identify" them "for evaluation by Medical Boards and appropriate referral to the PEB]." See Hassay I, 150 Fed. Cl. at 478.

Mr. Hassay's in-service medical records reflect that he reported symptoms of psychological stress and sought advice about his mental health on two occasions during his eight years of service. AR 99, 2532–34. He contends that in each instance the physicians who examined him should have referred him to an MEB but did not do so. See Pl.'s Mot. at 20–27. The Board, however, disagreed. It found that the records of those two examinations did not indicate that Mr. Hassay's mental fitness to continue to serve was in question. AR 2292–93. The Board's findings are supported by substantial evidence, as detailed below.

Mr. Hassay saw Dr. Peter Killian on August 13, 1999. AR 2532. He presented with a history of depression and bipolar disorder for which he was taking lithium. Id. He complained about disturbed sleep, lack of interest, guilt over a recent broken relationship, impaired concentration, and a reduced appetite. Id. He attributed his symptoms to his breakup with his girlfriend. Id. He did not attribute the stress he was feeling to his service, nor did he report any problems performing his duties, much less that his symptoms "significantly interfere[d]" with his ability to perform his duties. See id.; SECNAVINST 1850.4E encl. 8, § 8001(e). Further, he returned to his duties without any limitation after his visit with Dr. Killian and failed to show up for a follow-up appointment with the mental health clinic that Dr. Killian recommended.

In light of these facts, the Board found that Dr. Killian had no objective reason to conclude that Mr. Hassay's mental fitness to continue service was "questionable" and therefore no obligation to refer him for an MEB. Mr. Hassay disagrees. Pl.'s Mot. at 23–26. He emphasizes that Dr. Killian asked him to enter into a "contract for safety" while awaiting a follow-up mental health appointment. Id. at 24. He argues that this suggests that Dr. Killian must have considered Mr. Hassay's mental fitness to serve to be at least questionable. Id. at 24–25.

The Board reasonably found, however, that this request did not signal that Dr. Killian considered Mr. Hassay to be contemplating suicide, as Mr. Hassay alleges. See id. As it noted, Mr. Hassay had advised Dr. Killian that he had no suicidal ideations. AR 2294. The Board reasoned that if Dr. Killian had thought that Mr. Hassay were suicidal, he "would have insisted upon much more than a 'contract for safety' in the interim." AR 2293. It concluded that "Dr. Killian had no significant concerns for [Mr. Hassay's] safety apart from that which he would have for any patient complaining of depression." Id.

Mr. Hassay criticizes the Board for crediting Dr. Killian's assessment of his mental fitness because he was not a psychiatrist. Pl.'s Mot. at 24–25 (describing Dr. Killian as "a junior otolaryngology resident with no business providing psychiatric care"). But psychiatrist or not,

9

Dr. Killian's impressions were certainly not implausible given the information that Mr. Hassay provided to him. Mr. Hassay apparently did not tell Dr. Killian about the assaults that he had suffered on the U.S.S. Sides. He also gave Dr. Killian no reason to believe that he was having difficulties performing his duties as a Boatswain's Mate. See AR 2297.

Mr. Hassay also contends that the Board engaged in circular reasoning when it observed that Dr. Killian's failure to refer him to an MEB itself provides evidence that a referral was not warranted. Pl.'s Mot. at 26. Were this the only reason the Board provided for finding a referral to an MEB unwarranted, Mr. Hassay's criticism might have more force. But the Board also relied upon the fact that, objectively, the information Mr. Hassay provided to Dr. Killian about his mental health did not suggest that he was unfit to continue to perform his duties. AR 2293–95.

Mr. Hassay also contends that the Navy should have referred him to an MEB in 2000, after he consulted another Navy physician, Dr. Smith, for mental health counseling. Pl.'s Mot. at 26.[2] As described in detail in Hassay I, on this occasion Mr. Hassay again did not report that he was having any problems performing his duties. See 150 Fed. Cl. at 472. Instead, he told Dr. Smith that he was then experiencing stress as a result of "female relationships." AR 2533. Further, Dr. Smith opined that Mr. Hassay "d[id] not appear depressed," id., although he did acknowledge that Mr. Hassay "had multiple stressors & [was] presently feeling [a] need for return to counselors for his benefit," AR 2534.

The Board reasonably concluded that there was nothing about Dr. Smith's examination of Mr. Hassay that would have led Dr. Smith to conclude that Mr. Hassay's fitness to perform his duties was in question, including Mr. Hassay's request to resume counseling. AR 2293. It found that by the time of the appointment with Dr. Smith, Mr. Hassay had "stopped taking lithium, and reported no conditions or symptoms which could possibly raise doubts regarding [his] continued naval service." Id. It further observed that Dr. Smith was a Navy Captain and so would have been an experienced doctor, and it found "no reason to question [Dr. Smith's] judgment." Id. Mr. Hassay identifies nothing in the record that renders the Board's conclusions regarding Dr. Smith's credibility unreasonable. The Court therefore rejects his argument that Dr. Smith should have referred him for an MEB.

Mr. Hassay further argues that the determination of the San Diego Military Processing Station that he was medically disqualified from enlisting in the Army in 1998 should have rendered his fitness to continue to perform his duties with the Navy Reserves at least "questionable," which would have mandated an MEB referral. Pl.'s Mot. at 21–23. The Board reasonably rejected this contention as well. It explained that "the medical standards for enlistment into the military are very different and far more restrictive than are the medical standards for retention in the military." AR 2294.[3]

---

[2] Dr. Smith is referred to as a "USNR Medical Corps officer" and USNR Captain in the Board's decision. AR 2293.

[3] "For example," the Board noted, Mr. Hassay's "history of bipolar disorder and/or any symptoms of or treatment for depressive disorder within the previous 36 months would have disqualified [him] for enlistment in any of the armed services per paragraph 6.28 of [Department of Defense Instruction ("DODI")] 6130.03 (Volume 1)." AR 2294. "However," the Board observed, "the same [medical] conditions would only disqualify [him] for retention in the

Moreover, as described in Hassay I, it is unclear whether the Army's decision to disqualify Mr. Hassay was based on his perceived mental fitness as opposed to physical ailments. See Hassay I, 150 Fed. Cl. at 482 (observing that the "failure code" assigned to Mr. Hassay read "SPINE, OTHER MUSCULOSKELETAL/Psych left open"); AR Vol. VI at 223, ECF No. 12-6. And in any event, Mr. Hassay was unable to show that the Navy even had notice of the Army's determination. AR 2282 & n.4.

Mr. Hassay's contention that the Board erred in failing to find that his separation from the service should have triggered an MEB referral is similarly without merit. See Pl.'s Mot. at 26–27. SECNAVINST 1850.4E states that a member being processed for separation for reasons other than a physical disability is not to be referred for a disability evaluation except in limited circumstances not applicable here. SECNAVINST 1850.4E encl. 3, § 3202.[4]

Finally, Mr. Hassay contends that the Board did not give sufficient weight to the opinion of Dr. Foote, a former Navy psychiatrist, in concluding that the Navy was not required to refer him to an MEB because of his "questionable" fitness. Pl.'s Mot. at 25. In a 2021 letter he prepared after this Court's decision in Hassay I, Dr. Foote opined that based on Mr. Hassay's records, including the reports of Drs. Killian and Smith, it was "unconscionable" that he was not referred for a "full psychiatric evaluation of his fitness for duty in 1998 when he was denied transfer to the Army, in 1999 and 2000 when he sought treatment from the Navy for his mental illness, or immediately prior to his 2002 discharge." AR 2366.

The Board's most recent decision reflects that it fully considered and reasonably rejected Dr. Foote's opinion that Mr. Hassay should have been referred for an MEB on one of the four occasions he identified. It found that Dr. Foote's assertion that he would not have permitted Mr. Hassay to return to full duty if he had evaluated him, knowing what was in his records, "lack[ed] any credibility or support" because, among other things, Dr. Foote had not specified what was in Mr. Hassay's records that would have led him to that conclusion. AR 2295. In the Board's view, there was "literally nothing" in Mr. Hassay's in-service medical records "which would lead any reasonable and objective provider to such a conclusion." Id. Moreover, Dr. Foote did not start treating Mr. Hassay until 2013, and his report was issued in 2021, almost 20 years after Mr. Hassay left the service. The Board concluded that it was "very obvious . . . that Dr. Foote's

---

military if they either required persistent duty modifications to reduce psychological stressors or enhance safety or impaired [his] functions so as to preclude the satisfactory performance of required military duties of [his] office, grade, rank, or rating, per paragraph 5.28 of DODI 6130.03 (Volume 2)." Id. As the Board found, Mr. Hassay's conditions clearly did not meet either of the disqualifying criteria.

[4] Such an evaluation is required where a service member was previously found unfit but retained on active duty in a Permanent Limited Duty status, or where "the member's physical condition reasonably prompts doubt that he or she is Fit to continue to perform the duties of office, grade, rank or rating/MOS." SECNAVINST 1850.4E encl. 3, § 3202(g). Mr. Hassay was discharged because his enlistment period expired. AR Vol. IX at 387, ECF No. 12-9. He had not previously been found unfit for duty, and as described in the Board's opinion, his performance evaluations, prior medical examinations, and other relevant factors did not prompt doubt about his fitness to continue to serve.

.
.
.
.

comments in this regard were based upon his understanding of how [Mr. Hassay's] condition progressed after [his] discharge, and were offered solely in support of [his] request for relief rather than to offer an objective assessment of the evidence." Id. For these reasons, the Board concluded, it "did not find Dr. Foote's comments to be persuasive with regard to the issue of whether [Mr. Hassay] should have been referred for disability processing." Id.

Reasonable minds might disagree about whether there was "literally nothing" in the record that would support Dr. Foote's opinion that Mr. Hassay should have been referred for an MEB. Nonetheless, it was not unreasonable for the Board to conclude that Dr. Foote's views about what the Navy should have done in 1998, 1999, or 2000 were heavily influenced by his knowledge of what ultimately occurred well after Mr. Hassay's discharge, when Mr. Hassay's mental health took a significant turn for the worse.

The Court has considered Mr. Hassay's other arguments regarding whether the Navy violated its Disability Evaluation Manual by not referring Mr. Hassay for an MEB and finds them without merit. The determination whether a service member's continued fitness to perform his duties is sufficiently "questionable" to trigger an MEB referral is one that requires the exercise of discretion about matters that are within the purview and expertise of the military and its medical providers. And this Court is not empowered to substitute its judgment for that of the Board, where, as here, the Board has considered the evidence, applied the correct legal standards, and reached a plausible conclusion that is based on substantial evidence.

> 2. **The Board's Conclusions that Mr. Hassay Was Not Unfit and that His Continued Service Did Not Pose a Decided Medical Risk to His Health**

In its remand instructions in Hassay I, the Court directed the Board to review and consider the opinions of Dr. Foote and the other physicians who treated Mr. Hassay after he left the service to determine "whether Mr. Hassay's continued service either at the time of his discharge or in the preceding years presented 'a decided medical risk' to his health." 150 Fed. Cl. at 479 (quoting SECNAVINST 1850.4E encl. 3, § 3302(b)(1)); see also id. at 485. The Board complied with the Court's instructions. It considered the opinions of all of Mr. Hassay's medical providers, with particular attention to the views expressed by Dr. Foote. See AR 2284–87, 2297–99. It concluded based on the record, including Mr. Hassay's performance evaluations, that he had not established by preponderant evidence that he was unable to reasonably perform the duties of his office, grade, rank, or rating during any point in his service. Nor did he persuade the Board that his continued performance of his duties created "a decided medical risk" to his health.

Mr. Hassay contends that it was unreasonable for the Board to rely on his "cursory performance evaluations" in finding him fit for duty. Pl.'s Mot. at 28–30. The Court agrees that—as it observed in Hassay I—performance evaluations are not necessarily dispositive of whether a service member is fit for duty, at least where there is contrary evidence in the record or where the service member alleges that continued service poses a decided risk to their health. 150 Fed. Cl. at 480. But the Board did not rely exclusively on Mr. Hassay's performance evaluations when it found that he failed to show that he was unfit for duty at any point during his service. It also traced the trajectory of his symptoms after he left the service and found that it reflected that his service-connected psychiatric disorders did not begin to impact his functioning or ability to perform work in a material way until several years after his discharge. AR 2296.

12

As the Board explained, in August 2002, three months after he was discharged, Mr. Hassay went to the San Diego County Psychiatric Hospital to request a refill of his medications. AR 2284. The report of the brief psychiatric assessment he underwent states, among other things, that he "specifically denied any suicidal and/or homicidal thoughts, perceptual disturbances, or the use of street drugs and/or alcohol (although [he] admitted to using marijuana a few weeks prior)." AR 2372. It also states that Mr. Hassay was "believed to be adequately domiciled" at the time, id., that his thought processes were "logical and goal directed," and that "there [was] no evidence of paranoid, grandiose or obsessional ideation." AR 2373.[5]

Mr. Hassay underwent another assessment at the San Diego County Psychiatric Hospital about 17 months later, in January 2004. AR 2285. This assessment was also conducted in connection with a request for prescription medication. Id. The report of the second assessment was similar to the earlier assessment. It "suggested that there was no indication of any psychiatric emergency at that point, and [Mr. Hassay] specifically denied any suicidal and/or homicidal thoughts, perceptual disturbances, manic excitement and the use of illicit drugs or alcohol to excess." AR 2375. Although Mr. Hassay was by this time homeless, he "reported being in generally good health and had no acute complaints." Id. The psychiatrist who conducted this assessment again described his "potential for harm" as "[l]ow now and for the foreseeable future." AR 2376.

As the Board noted, Mr. Hassay's mental health deteriorated significantly at some point after he relocated from San Diego to the San Francisco Bay Area following his January 2004 psychiatric assessment. AR 2285. It explained:

> On or about 28 September 2005, [Mr. Hassay] appeared at the Sausal Creek Outpatient Stabilization Clinic in Oakland, California, seeking a refill of [his] medications. While [he was] waiting to be seen, [he] began to make superficial cuts on [his] wrist with a pen. [He was] subsequently admitted to the Alameda County Medical Center, and then referred for inpatient treatment at the Villa Fairmont Mental Health Rehabilitation Center ("VFMHRC") the following day. [He] remained at the VFMHRC from 29 September 2005 to 4 October 2005. The records from these encounters reflect a distinct change in [his] mental health since [his] previous encounter in January 2004. Whereas previously [he] demonstrated no suicidal thoughts and w[as] not considered to be at risk of self- harm, now [he was] preoccupied with death. Whereas previously there had been "no evidence of paranoid, grandiose or obsessional ideation," in 2005 [he was] clearly paranoid and delusional and for the first, but not last, time [was] noted as psychotic. [He] described hallucinations "from the devil" and felt that people were out to get [him]. [His] treatment records during this stay at VFMHRC reflect that [he] felt

---

[5] In its decision in Hassay I, the Court noted that the Board of Veterans Appeals' decision reflected that Mr. Hassay was hospitalized for depressive disorder during this visit to the San Diego County Psychiatric Hospital. 150 Fed. Cl. at 472. As the BCNR points out, however, no such hospitalization is reflected in the records. AR 2284 n.9. Instead, the records reflect that Mr. Hassay was not hospitalized for any mental health condition until several years later, in late September 2005. Id.

>overwhelmed by [his] recent move from San Diego, as [he] had a poor support system, a poor housing system, and low to no income.

Id.; see also AR 2286 (describing Mr. Hassay's subsequent deterioration and treatment for mental illness).

The Board observed that the trajectory of Mr. Hassay's illness was inconsistent with the notion that the continued performance of his duties during his period of service presented a risk to his mental health. To the contrary, the Board suggested it seemed more likely that it was the end of his service that "adversely affected [his] health and safety." AR 2296. Specifically, the Board noted that "[his] mental health deteriorated only [after he was] removed from the USNR for approximately two to three years and the lack of income and stability which that service provided apparently contributed to that deterioration." Id. It observed that in Mr. Hassay's 2011 claim for Social Security benefits, he reported that it was not until July 2005 that he became unable to work as a result of his mental health conditions. AR 2297. The Board opined that if Mr. Hassay was "capable of maintaining civilian employment prior to that date," then he was "certainly capable of performing the very generic duties of a Boatswain's Mate." Id.

The Board found that the only evidence in the record suggesting that Mr. Hassay's continued service created a decided medical risk to his health again came from Dr. Foote's letters. In his January 2017 letter, for example, Dr. Foote opined that Mr. Hassay's problems had been "overlooked" during his service, that "it was clear that [Mr. Hassay] could not handle the pressures of the active duty status when he was on active duty," and that he "should not have been retained even in the reserve status given his symptoms and inability to adapt to the military life." AR Vol. IV at 153, ECF No. 12-4. Similarly, in his April 2021 letter Dr. Foote stated that it was "clear" to him that "remaining in the military created serious harm for [Mr. Hassay]." AR 2367.

But as described above, the Board concluded that Dr. Foote's observations about Mr. Hassay's capacity to perform his duties and the harm he suffered from his continued service lacked credibility because they were inconsistent with Mr. Hassay's in-service medical records and his performance evaluations. It assigned greater weight to the contemporaneous performance evaluations prepared by his chain of command and the impressions of the physicians who examined him during his service than to the opinions of Dr. Foote, who had not met Mr. Hassay until ten years after leaving the service, when his mental health had already seriously deteriorated.

Further, to some extent Dr. Foote's opinions provide support for the Board's conclusions that it was not until after Mr. Hassay left the service that Mr. Hassay's mental health issues had an impact on his ability to function. As the Board noted, "even Dr. Foote stated that it was from the 'time of discharge forward [that] [Mr. Hassay's] ability to function was seriously compromised,' and that the negative outcomes of [his] mental health conditions 'occurred upon [his] being discharged.'" AR 2297–98 (first alteration in original) (quoting AR 2366–67).

Mr. Hassay argues that the opinion of his VA mental health team and the views of Dr. Constance Louie, a clinical psychologist at the San Francisco Vet Center, establish that he was unfit because his continued service presented a decided medical risk to his health. Pl.'s Mot. at 35–36. He notes that the VA team observed that he "was clearly and severely impacted by his time in the military, and the consequence of those experiences has left him severely disabled, and

14

in need of compensation." AR 2573. And Dr. Louie similarly recounted that, as a result of his service-connected mental disorders, when Mr. Hassay "was not on the ship, in his civilian world, he drank more, got into numerous fights, and experienced anxiety attacks." AR 2566.

But the issue before the Court is not whether the PTSD and other psychiatric disorders that Mr. Hassay developed as a result of the assaults he suffered are service-connected or whether they have had a negative effect on his civilian life. Rather, the issue is whether those disorders rendered him unfit to perform the duties of his military position during his eight-year period of service. The Court must defer to the Board's reasonable conclusion that Mr. Hassay was fit to perform his duties during his service up to the point of discharge.

Finally, Mr. Hassay contends that the liberal consideration principles that apply under the DoD guidance required the Board to give greater weight than it did to the opinions of the medical professionals who treated Mr. Hassay after his discharge, particularly Dr. Foote and Mr. Hassay's VA psychiatrist, Dr. Sally Vrana. He argues that the Kurta Memo prohibited the BCNR from "disregarding Dr. Foote's opinion without clear evidence to the contrary." Kurta Memo at A7 (stating that "[a]bsent clear evidence to the contrary, a diagnosis rendered by a licensed psychiatrist or psychologist is evidence the veteran had a condition that may excuse or mitigate the discharge"). These arguments are unpersuasive.

To begin with, the Board did not "disregard" Dr. Foote's diagnosis. In fact, it credited his diagnoses of PTSD and related disorders arising out of military sexual trauma, as well as the diagnoses of the other doctors who treated Mr. Hassay in the years after his discharge. AR 2289–90. What it found unpersuasive was Dr. Foote's opinion that Mr. Hassay was unfit to perform his duties during his service, or that doing so created a decided medical risk to his health. AR 2298. As discussed above, it so found either because of the presence of evidence to the contrary in the record or because of the absence of evidence to support the conclusions Dr. Foote reached. It was also influenced by the fact that Dr. Foote's opinions concerned matters that had occurred at least a decade before he even began treating Mr. Hassay. AR 2298–99.

Applying liberal consideration to Mr. Hassay's claims did not require the Board to credit Dr. Foote's opinion or any other evidence simply because the opinion or evidence was more favorable to Mr. Hassay's claims. Instead, it required the Board to apply the principles set forth in the guidance when weighing the evidence and making its determination whether Mr. Hassay met his burden of proof. See Akins v. Esper, No. 4:19-CV-00420, 2020 WL 5087159, at *4 (E.D. Ark. Aug. 27, 2020) (stating that the requirement of liberal consideration in the guidance does not "mandate relief, but provide[s] principles and standards the review board should use in making its determination").

The Court is satisfied that in this decision the Board did precisely that. Further, its decision reflects that it conducted a thorough review of the entire record. It also explained its reasoning in detail. The Board's findings that—notwithstanding his service-connected PTSD and related disorders—Mr. Hassay was mentally fit "to perform the duties of his office, grade, rank or rating" are supported by substantial evidence. 10 U.S.C. § 1204. The Court therefore must defer to the Board's determination that he has not established entitlement to a correction of his records to reflect a disability retirement.

## **CONCLUSION**

For the reasons set forth above: 1) the government's motion to dismiss pursuant to RCFC 12(b)(1) is **DENIED**; 2) plaintiff's motion for judgment on the administrative record, ECF No. 73, is **DENIED**; and 3) the government's cross-motion for judgement on the administrative record, ECF No. 78, is **GRANTED**.

The Clerk of Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Chief Judge
